1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                 FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   OMAR CASILLAS,                           No. 1:17-cv-00511-LJO-SKO (HC)

12                 Petitioner,                **FINDINGS AND RECOMMENDATION
                                              TO DENY PETITION FOR WRIT OF
13        v.                                  HABEAS CORPUS**

14   SECRETARY OF CORRECTIONS,                **[THIRTY DAY OBJECTION DEADLINE]**

15                 Respondent.

16

17        Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

18   pursuant to 28 U.S.C. § 2254.  He is currently serving a sentence of 29 years for his conviction of

19   several offenses involving an attempted murder.  He has filed the instant habeas action

20   challenging the conviction. As discussed below, the Court finds the claims to be without merit

21   and recommends the petition be **DENIED.**

22   **I.       PROCEDURAL HISTORY**

23        On February 28, 2013, a Kern County jury found Petitioner guilty of attempted murder

24   (Cal. Penal Code §§ 664, 187(a)), assault with a semiautomatic firearm (Cal. Penal Code

25   §245(b)), being a felon in possession of a firearm (Cal. Penal Code §29800(a)(1)), being a felon

26   in possession of ammunition (Cal. Penal Code § 30305(a)(1)), and felony false imprisonment

27

28

                                              1

(Cal. Penal Code § 236). (Doc. 61-2 at 89.[1]) Petitioner was sentenced to a total state prison term of 29 years. Id.

Petitioner appealed to the California Court of Appeal, Fifth Appellate District ("Fifth DCA"). On December 14, 2015, the Fifth DCA ordered the abstract of judgment corrected to reflect that certain enhancements were in fact dismissed, but in all other respects, the judgment was affirmed. (Doc. 61-20.) Petitioner then filed a petition for review in the California Supreme Court. (Doc. 61-21.) The petition was denied on February 17, 2016. (Doc. 61-22.)

Petitioner also sought collateral relief in the state courts. On March 1, 2017, Petitioner filed a petition for writ of habeas corpus in the Kern County Superior Court. (Doc. 61-23.) The superior court denied the petition in a reasoned decision on April 25, 2017. (Doc. 61-24.) He then filed a habeas petition in the California Supreme Court which was summarily denied on November 29, 2017. (Doc. 61-26.)

On April 5, 2017, Petitioner filed a petition for writ of habeas corpus in this Court. (Doc. 1.) On December 22, 2017, following a stay of the proceedings pending exhaustion of state remedies, Petitioner filed a Third Amended Petition, which is the operative pleading. (Doc. 30.) On April 4, 2019, Respondent filed an answer to the petition. (Doc. 60.) On July 15, 2019, Petitioner filed a traverse to Respondent's answer. (Doc. 67.)

## II. FACTUAL BACKGROUND

The Court adopts the Statement of Facts in the Fifth DCA's unpublished decision[2]:

*Victim's Account of Incident to Detective Castaneda*

Detective Castaneda questioned the victim Andrew Fern on October 11. The session was recorded with video and audio and played for the jury. A written transcript of the questioning was admitted into evidence as well. Castaneda was aware Fern was on probation and had an electronic monitor or global positioning system (GPS) tracking device.

Fern told Castaneda that on the day of the incident he went to his uncle's apartment. As Fern was playing a video game, Dulcinea Robinson came into his uncle's apartment, shut the door, and told Fern not to open the door if anyone came up

---

[1] Docket citations are to ECF pagination.

[2] The Fifth DCA's summary of facts in its unpublished opinion is presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1). Therefore, the Court will adopt the Fifth DCA's summary of the facts. Moses v. Payne, 555 F.3d 742, 746 (9th Cir. 2009).

2

behind her. She went into the back room; shortly thereafter someone pounded on the door. Fern opened the door. A male on the other side told Fern, " 'it's not going down like this.' " Fern later identified that male as defendant in a photographic lineup.

Defendant told Fern that Robinson just "got" an ounce of defendant's "shit." Fern told defendant he had nothing to do with the woman. With defendant waiting outside the apartment behind the screen door, Fern walked to the back room and heard Robinson talking to Ariana Sullivan. Fern's uncle opened the door to the room and Fern saw Robinson holding a bag in her hand. Fern told Robinson it was stupid for her to have taken defendant's drugs. Fern took the bag from Robinson and brought it out to defendant. Defendant complained he did not receive all of the drugs because there had been an ounce. Fern agreed there was not an ounce in the bag. Defendant again told Fern it was not "going down like this."

Defendant said three quarters of the drugs were missing and demanded money. Fern told Robinson and the other people in the house that they needed to go outside and talk to defendant immediately. Defendant backed up a small, yellow SUV to the stairs leading to the second floor apartment. Fern told the others defendant was going to do something dumb. Fern saw defendant take something from under the hood of the SUV. Fern said defendant had a gun, asked the others who defendant was, and what they had been doing. Fern walked outside his uncle's residence because "kids" were present, walked down the stairs, and met defendant.

Defendant cocked the gun. Fern told him he did not need to do anything. Fern said he was going to go with defendant to keep people from going to jail. Fern confirmed defendant did not want the remnants of the bag, but money. Fern assured defendant they would try to get money. Fern rode with defendant in the SUV. On the way, defendant pistol-whipped Fern, who then grabbed defendant's arm and chest. The two struggled as the SUV slowly coasted.

Fern told defendant he was on a GPS monitor and that Fern would let go of defendant and let him keep his gun. Defendant drove to a residence on Oasis Street, parked, and talked to Fern. Defendant called someone on the phone; a heavy-set Hispanic man arrived, and he talked to defendant in Spanish. Defendant informed Fern that his brother wanted to "fucking execute" Fern. They went to another residence on North Norma and Coso, though Fern was not sure of the exact location. Defendant left the motor of his vehicle running, and they went inside the house.

Inside the residence, defendant called people and told them he had kidnapped Fern. Fern reminded defendant that Fern's actions had saved the young women at his uncle's home from being shot and defendant from going to jail. Fern told defendant that because he was not from the area, it was dumb of defendant to tell people he had kidnapped Fern. Fern also told defendant he was stupid for getting "jacked by a bunch of little fucking scally wags" and for assuming Fern had anything to do with it.

Defendant received a text offering $1,000 to release Fern and informing defendant a large group of White people were at the Oasis Street location. Defendant and Fern went in the garage. Defendant received another text that a group of White people were breaking the windows at the Oasis Street location. Defendant put a plastic tarp on the floor of the garage and told Fern to stand on it. Defendant jumped onto a vehicle parked in the garage. Fern asked defendant not to point the gun at him, and told defendant he did not need to shoot.

3

Fern persuaded defendant to let him make one quick call to find out what had happened. Fern called Russell Lester who told Fern he heard what happened, picked up Robinson, and some windows got broken. Fern told Lester he had been at a house on Oasis Street but he was now with defendant, he did not know defendant's name, and they were at a house defendant had been working on. Fern also told Lester defendant pulled a gun and was threatening to kill him. Defendant became more agitated.

Fern refused defendant's demand to get onto the tarp. Defendant threatened to shoot Fern in the arm. Fern kept the phone in his back pocket with the connection to Lester still open. Defendant held the gun with two hands about to fire, but Fern distracted him and then slapped the gun from defendant's grasp. Fern struck defendant in the face. Defendant stumbled backwards and Fern beat defendant on the face. As defendant fell over, two bullets were quickly fired from the gun.

Fern later learned Lester heard the shots over the phone and thought Fern had been shot. At that point, Lester slapped Robinson to the ground and then yelled at her for being stupid and dragging Fern into the situation. Robinson suddenly remembered the other place defendant might be located and told Lester to take her there. This was how Fern's friends went to the intersection of Norma and Coso.

Fern had gotten cut but thought he had been shot and ran out of the garage. Defendant fired two more shots. Defendant fired three more shots at Fern as he headed toward a fence. Fern rolled on the ground to avoid the gunfire. As Fern stood and looked back, defendant tried to fire the gun again but had run out of ammunition. Defendant demanded Fern lie on the ground. Instead, Fern jumped over a chain-link fence and hid in a nearby yard as defendant went back to the garage.

Fern watched defendant come back out of the garage, looking for Fern and assuming he had run down the alley. Fern saw defendant jump into his SUV and drive away. Fern described the gun as being a small, chrome .25–caliber. Fern described defendant as being Hispanic and not having a spider-web tattoo.

Castaneda and another officer had prepared a photo lineup that included defendant and five other people. Castaneda had training in the signs of methamphetamine intoxication and Fern did not appear to Castaneda to be under its influence. Fern's demeanor was calm until Castaneda handed him the photo lineup.

When Fern received the photo lineup, he became emotional and started to tear up. Just before Fern circled the picture and signed it, he asked Castaneda what was going to happen to him. Fern was concerned about being a snitch. Fern was aware the people who were arrested on October 6 had already provided a statement. Castaneda explained to Fern investigators had questioned an eyewitness, went to the location of the shooting with the witness, and found shell casings.

*Victim's Testimony*

Fern began his testimony stating he barely remembered the events of October 6, 2012. [Fn.2] Fern stated he had been in a program in Ridgecrest that required him to take a urine test. Fern had a GPS tracking device attached to him. Instead of walking across town, Fern walked to his uncle's house to get a ride. At his uncle's house, there were a couple of girls and "a dude" named Ryan from Bakersfield, who was "blasted up" with tattoos. Ryan was with his girlfriend, Dulcinea Robinson.

    [Fn.2] The dates surrounding the incident all refer to the year 2012.

4

Fern's uncle would not let him inside the house. Fern left with Ryan on foot. Ryan kept trying to take Fern toward "stupid little dump places." Fern objected, explaining to Ryan he had to take a urine test. Ryan was a member of Fern's former gang, the East Kern Hellbound Peckerwoods. Ryan accused Fern of being a rat and started hitting him. But Fern had the better of Ryan and "dropped him." Fern called his friend Russell Lester for a ride, then jumped over a fence and walked down an alleyway away from Ryan.

Fern denied he went to Oasis Avenue, a place he called "the dump of Ridgecrest." Fern said he was about halfway down the alley, in the area of Norma and Coso, when law enforcement arrived. People had made reports of shots fired at Fern, but Fern did not remember any gunshots being fired. The police picked up Fern two blocks away. Fern's friends were lined up on the curb telling him he had been shot at.

Investigators questioned Fern about the incident four or five days later. Fern testified that prior to being questioned, he had "slammed" methamphetamine with Southern Comfort and had also snorted a Xanax. Fern explained he was intoxicated during questioning and did not remember much of what he told investigators. Everything he told investigators was "a pretty big blur." At trial, Fern said the account of events he told investigators was a story Robinson and Ariana Sullivan told him to say. The two women had told Fern whom to identify during a lineup conducted at the jail.

A week after questioning, Fern cut off his ankle monitor because he realized he had wrongfully accused defendant. Fern also wanted to run because he was afraid he would be killed.

*Eyewitnesses and Initial Investigation*

Donald Beaver testified he owned property on Norma Street, and defendant was working on that property on October 6. Beaver knew defendant through his grandson, who had served time in prison with defendant.

Between 5:15 and 5:30 p.m. on October 6, John Froehner was in his driveway helping his sister's children into her vehicle when he heard three or four gunshots from Beaver's property on Norma Street. Froehner saw a man with his arm over the fence and smoke coming from a gun. There was a yellow SUV backed into the driveway of the house. After the gunshots, the shooter loaded tools into the back of the SUV and drove away. After the shooting, Froehner called 911. Before police arrived, a group of people showed up in two cars and fanned out over the area.

Officer Kyle Cushman of the Ridgecrest Police Department was dispatched to investigate shots fired and people shouting just before the 6:00 p.m. end of his shift on October 6. Cushman arrived at the corner of West Coso and Norma and saw several individuals with whom he had previous encounters, including Richard Caine, Jr., Luis Enriquez, Scott George and Dulcinea Robinson, who is also known as Ruvidia Robinson. Cushman had them sit on the curb. Another officer found Fern at West Ridgecrest Boulevard and Sunset and brought him back to Coso and Norma.

Fern told Cushman he had been in a fight with a male who was five feet five inches tall, weighed 230 to 240 pounds, and had a spider web tattoo on his right forehead. The man had called Fern a snitch. Fern did not tell Cushman someone had shot at him. Fern did not want to press charges and did not want to be a snitch.

Detective Manuel Castaneda and his partner found three spent shell casings from a .380–caliber semiautomatic firearm on the ground just inside the backyard of the property on Coso and Norma. There was a thick plastic painter's tarp in the garage of the property. The house was undergoing remodeling. No shell casings or bullet impact marks were found in the garage. Castaneda questioned Robinson, who said she had been "hanging out" with defendant and admitted stealing his drugs.

*GPS Evidence*

Fern's GPS ankle monitor communicated with a cell tower every three minutes. On October 6, the monitor indicated Fern was at his uncle's apartment on West Wilson Avenue in Ridgecrest from 3:24 p.m. until 3:45 p.m. At 3:51 p.m., Fern was at the 11000 block of California Avenue. Between 3:57 p.m. and 4:06 p.m., Fern was on Oasis Drive. From 4:15 p.m. until 5:27 p.m. Fern was apparently at the same address on North Norma and Coso Avenue, although between 4:17 and 5:27 p.m., Fern's location on the monitor registered back and forth from Norma to Coso. Between 5:27 p.m. to 5:36 p.m., Fern was traveling from West Coso to the 500 block of Ridgecrest.

*In–Person Lineup*

Daniel Stevenson, an investigator for the Kern County District Attorney's Office, visited Fern in jail on June 25, 2013. Fern told Stevenson he had been taken from a home and held by another person. Fern, who appeared to be afraid and did not want to testify, asked for protection or relocation. A couple of times Fern said he believed he would be killed if he testified. Fern appeared emotional and teared up as Stevenson was talking to him. That same day, an in-person lineup was conducted at the jail. Defendant was one of the subjects in the lineup. Fern did not identify defendant as the person who shot at him.

*Kite Evidence*

On July 15, 2013, Kern County Sheriff Deputy Jeff Brockett transported inmates, including defendant, from the Lerdo pretrial facility to the courthouse on a bus. Fern was coming to court the same day on the same bus. Brockett searched the inmates before they boarded the bus and found a "kite," or note, in defendant's shirt pocket. The note said: "Hey bro. I need you to write me a letter saying that ... Det Castaneda made you say all that, that he coered [*sic*] and intimidated you." Defendant's name, booking number, and pod number were written on the back of the note with the message, "we will get paid" with two dollar signs.

The parties stipulated defendant had been convicted of a felony prior to October 6. The parties further stipulated both defendant and Fern were ordered to court appearances on July 15, 2013.

*Defendant's Testimony*

Defendant was in jail from September 13 until October 4. Defendant made a passing reference to taking psychotropic medication. Don Beaver hired defendant to remodel his house on North Norma. Defendant met Beaver's grandson in prison where defendant was serving a sentence for receiving stolen property. Defendant worked on Beaver's house from 6:00 or 7:00 a.m. on October 6 until he loaded up his tools to leave between 4:00 and 4:30 p.m. Defendant heard no gunshots that day. Defendant denied knowing Robinson or Fern, and he denied shooting at Fern. Defendant denied writing the kite found in his shirt. The kite was passed to him on

the bus.

People v. Casillas, 2015 WL 8483864, at *1-5 (Cal. Ct. App. Dec. 10, 2015).

**III.     DISCUSSION**

A.     Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution.  The challenged conviction arises out of the Kern County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

B.     Legal Standard of Review

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S. at 412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result."  Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at 405-

1    406).

2         In Harrington v. Richter, 562 U.S. 86, 101 (2011), the U.S. Supreme Court explained that

3    an "unreasonable application" of federal law is an objective test that turns on "whether it is

4    possible that fairminded jurists could disagree" that the state court decision meets the standards

5    set forth in the AEDPA.  The Supreme Court has "said time and again that 'an unreasonable

6    application of federal law is different from an incorrect application of federal law.'"  Cullen v.

7    Pinholster, 563 U.S. 170, 203 (2011).  Thus, a state prisoner seeking a writ of habeas corpus from

8    a federal court "must show that the state court's ruling on the claim being presented in federal

9    court was so lacking in justification that there was an error well understood and comprehended in

10   existing law beyond any possibility of fairminded disagreement."  Harrington, 562 U.S. at 103.

11        The second prong pertains to state court decisions based on factual findings.  Davis v.

12   Woodford, 384 F.3d 628, 637 (9th Cir. 2003) (citing Miller-El v. Cockrell, 537 U.S. 322 (2003)).

13   Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the

14   petitioner's claims "resulted in a decision that was based on an unreasonable determination of the

15   facts in light of the evidence presented in the State court proceeding."  Wiggins v. Smith, 539

16   U.S. 510, 520 (2003); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997).  A state court's

17   factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable

18   among reasonable jurists."  Jeffries, 114 F.3d at 1500; see Taylor v. Maddox, 366 F.3d 992, 999-

19   1001 (9th Cir. 2004), cert. denied, Maddox v. Taylor, 543 U.S. 1038 (2004).

20        To determine whether habeas relief is available under § 2254(d), the federal court looks to

21   the last reasoned state court decision as the basis of the state court's decision.  See Ylst v.

22   Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir.

23   2004).  "[A]lthough we independently review the record, we still defer to the state court's

24   ultimate decisions."  Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

25        The prejudicial impact of any constitutional error is assessed by asking whether the error

26   had "a substantial and injurious effect or influence in determining the jury's verdict."  Brecht v.

27   Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007)

28   (holding that the Brecht standard applies whether or not the state court recognized the error and

8

reviewed it for harmlessness).

C.     Review of Petition

The petition presents the following claims for relief: 1) Defense counsel rendered ineffective assistance in failing to file a motion to dismiss a twice-dismissed charge pursuant to section 1387 and for failing to object to a jury instruction on felony false imprisonment; 2) The trial court violated Petitioner's right to counsel by denying his motion for new counsel; 3) Defense counsel rendered ineffective assistance in several instances; 4) The prosecutor committed misconduct by knowingly using false evidence in the form of perjured testimony to obtain a conviction; 5) Petitioner's right to confrontation was violated when a witness's statements were introduced at trial and Petitioner was not afforded an opportunity to cross-examine; and 6) Petitioner was denied due process by the combined effect of errors in his case.

1.   Ineffective Assistance of Counsel

Petitioner first claims trial counsel rendered ineffective assistance when he failed to timely bring a motion to dismiss a charge that had already been dismissed on two prior occasions. He contends that a motion pursuant to section 1387 would have been meritorious and the charge of unlawful possession of a firearm would have been dismissed. Petitioner also contends that trial counsel failed to object to a jury instruction on false imprisonment. Petitioner raised this claim on direct appeal in the state courts. In the last reasoned decision, the Fifth DCA denied the claim as follows:

**I. Failure to File Section 1387 Motion**

Defendant contends his trial counsel was ineffective for failing to file a motion pursuant to section 1387 to dismiss count 4, possession of a firearm by a felon (§ 29800, subd. (a)(1)). According to defendant, this count had been dismissed twice before for statutory cause and could not be filed a third time. We disagree.

**A. Prior Proceedings**

This action began in Kern County as case No. RF006440A. Defendant was originally charged with three counts. Count 1 alleged assault with a firearm on October 6, 2012. Counts 2 and 3 alleged respectively that on October 12, 2012, defendant was a felon in possession of a firearm and a felon in possession of ammunition. At the preliminary hearing, Detective Castaneda testified concerning the incident on October 6, 2012. On November 21, 2012, an information with the same allegations was filed. On January 24, 2013, the court granted a section 995 motion filed by defendant as to counts 2 and 3, finding there was no evidence at the

9

preliminary hearing concerning defendant's alleged status as a felon. The next day, the court granted the People's motion to dismiss the remaining allegation in the interests of justice.

A new criminal complaint was filed in case No. RF006526A on January 25, 2013, charging defendant with the same counts alleged in the prior action. On March 20, 2013, the prosecutor filed an amended complaint, adding allegations of attempted murder, count 1, and kidnapping for ransom, count 2. Assault with a semiautomatic firearm became count 3, and being a felon in possession of a firearm became count 4. All of the counts alleged the incident occurred on October 12, 2012.

At the preliminary hearing, Detective Castaneda testified concerning the incident on October 6, including the facts that Fern explained defendant possessed a semiautomatic pistol, fired shots at Fern, and four .380–caliber shell casings were found at the North Norma residence. A .22–caliber magnum revolver was found at defendant's residence when he was arrested October 12. A .380–caliber round cannot be fired from a .22–caliber revolver.

Defense counsel moved to have count 4 dismissed, among other reasons, based on a conflict in the October 6 and October 12 dates. The prosecutor made a motion to have the complaint amended to reflect the allegations occurred on October 6. The prosecutor pointed out the discrepancy in dates regarding count 4 resulted from the fact a gun was found in defendant's residence on October 12. The court asked the prosecutor which date applied to count 4. The prosecutor requested the dates for all counts in the amended information refer to October 6 based on the testimony at the preliminary hearing.

The court permitted the prosecutor to amend counts 1, 2, and 3 to reflect the offenses occurred on October 6. As to count 4, the court stated it was discharging defendant "for a failure of notice as to the alleged violation." The court acknowledged its finding was inconsistent with its holding order on count 3, assault with a semiautomatic firearm. It concluded, however, there was insufficient notice to the defendant regarding possession of a firearm on October 6, "especially since there is the confusion as to which acts they are attempting to charge the defendant with." Although the trial court did not cite any section of the Penal Code when it dismissed count 4, the clerk's minute order stated count 4 was dismissed for insufficient cause pursuant to section 871. [Fn.3]

> [Fn.3] Section 871 permits the dismissal by the trial court of a criminal complaint for insufficient cause where "it appears either that no public offense has been committed or that there is not sufficient cause to believe the defendant guilty of a public offense...."

**B. Section 1387**

Section 1387 states that pursuant to its chapter, or to sections 859b, 861, 871, or 995, an order terminating an action "is a bar to any other prosecution for the same offense if it is a felony ... and the action has been previously terminated pursuant to this chapter, or to Section 859b, 861, 871, or 995...." Defendant argues his case was dismissed the second time by the magistrate pursuant to section 871 and further prosecution is barred by section 1387. We disagree for the following reasons.

As a preliminary matter, we note the magistrate did not make a finding pursuant to section 871 even though the clerk so indicated in the minute order. The court expressly noted a lack of fair notice to defendant as to which violation of section

29800, subdivision (a)(1), and on what date, he was being charged. The court's finding was neither an express nor an implied finding there was insufficient evidence to hold defendant on count 4. Where there is a discrepancy between the oral pronouncement of judgment and the minute order or abstract of judgment, the court's oral pronouncement generally controls over the clerk's minute order. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185–186; *People v. Zackery* (2007) 147 Cal.App.4th 380, 385.)

The first dismissal occurred because there was no evidence before the court defendant was a felon. During the second preliminary hearing, the magistrate specifically identified the lack of notice to the defendant because there was evidence of two separate handguns, a .22–caliber weapon found in the defendant's residence on October 12, and shell casings from a .380–caliber gun fired by defendant on October 6. Thus, there was sufficient evidence from the second preliminary hearing to support two separate counts that defendant was a felon in possession of a firearm on two different dates. When the magistrate dismisses a count based on insufficient evidence, there is a dismissal within the meaning of section 871. This is so even without a formal order of dismissal where there is a decision not to hold the defendant. (*Brazell v. Superior Court* (1986) 187 Cal.App.3d 795, 800; *In re Williams* (1985) 164 Cal.App.3d 979, 983.) Here, because the trial court's dismissal was not based on section 871, the holdings of *Brazell* and *Williams* do not apply to the facts of the instant action.

Furthermore, because the evidence supported, for purposes of section 1387, two separate section 29800, subdivision (a)(1) offenses, defendant was not charged a third time with the "same offense." Instead of charging defendant with a violation of the statute on October 12, the information charged him with violating the statute on October 6. The evidence adduced at the second preliminary hearing supported an allegation of this offense on either or both dates. We further agree with the People that a so-called "qualifying termination" did not otherwise occur pursuant to the chapter containing section 1387, or to sections 859b, 861, 871, or 995.

The parties devote a great deal of legal analysis of the California Supreme Court's case in *People v. Traylor* (2009) 46 Cal.4th 1205, 1211–1213. In *Traylor*, however, our high court was not analyzing the situation we have here, an allegation of two separate offenses occurring on two different occasions. Applying the statutory elements test, the Supreme Court in *Traylor* analyzed whether felony vehicular manslaughter had the same elements of the misdemeanor offense of negligent vehicular manslaughter and concluded the elements of both offenses were not the same. (*Ibid.*) We find the facts and analysis of the *Traylor* decision largely inapposite to those here.

Finally, we reject defendant's assertion that defense counsel was ineffective for failing to file a motion to dismiss count 4 pursuant to section 1387. To prevail on a claim of ineffective assistance of trial counsel, the defendant must establish not only deficient performance, which is performance below an objective standard of reasonableness, but also prejudice. Prejudice must be affirmatively proved. The record must affirmatively demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. (*People v. Maury* (2003) 30 Cal.4th 342, 389.) Because we have concluded there is no merit to his underlying section 1387 contention, defendant has failed to demonstrate prejudice.

## II. Alleged Instructional Error

Defendant was charged in count 2 of the information with kidnapping for ransom (§ 209, subd. (a)). The trial court asked defense counsel if he wanted an instruction for the lesser included offense of felony false imprisonment by violence, menace, fraud, or deceit (§ 237, subd. (a)). Defense counsel agreed to the trial court's proposal and the court informed the parties it would instruct the jury with CALCRIM Nos. 1240 and 3517. Defense counsel did not lodge an objection to the proposed instructions.

Defendant contends that under the statutory elements test, kidnapping for ransom can be accomplished by means other than by force or fear. A violation of section 209, subdivision (a) can be accomplished by, among other things, seizing, confining, inveigling, enticing, abducting, and concealing. None of these means involve force or fear as defined in section 207, subdivision (a) for kidnapping. According to defendant, when this is so, the lesser included offense is not felony false imprisonment, an offense requiring violence or menace, but simple false imprisonment, which is only a misdemeanor under sections 236 and 237, subdivision (a).

Defendant contends defense counsel was ineffective for permitting his client to be convicted of a lesser related rather than a lesser included offense and that defense counsel was ineffective for failing to request instructions on the lesser included offense of misdemeanor false imprisonment. We reject these contentions because we find defendant had adequate notice of the lesser included offense of felony false imprisonment under the accusatory pleading test and there was no evidence presented at trial to support a jury finding of misdemeanor false imprisonment. Defense counsel, therefore, was not ineffective.

Our Supreme Court has applied two tests in determining whether an uncharged offense is necessarily included within a charged offense: the statutory elements test and the accusatory pleading test. The elements test is satisfied if the statutory elements of the greater offense include all of the statutory elements of the lesser offense, such that all of the legal elements of the lesser offense are also the elements of the greater offense. If a crime cannot be committed without also necessarily committing the lesser offense, the latter is a lesser included offense within the greater. (*People v. Bailey* (2012) 54 Cal.4th 740, 748; *People v. Reed* (2006) 38 Cal.4th 1224, 1227–1228.)

Under the accusatory pleading test, a lesser offense is included within the greater charged offense if the facts alleged in the accusatory pleading include all of the elements of the lesser offense. (*People v. Bailey, supra,* 54 Cal.4th at p. 748; *People v. Reed, supra,* 38 Cal.4th at pp. 1227–1228.) The accusatory pleading test arose to ensure that defendants receive notice before they can be convicted of an uncharged crime. (*People v. Reed, supra,* at p. 1229; *People v. Lohbauer* (1981) 29 Cal.3d 364, 368.) The accusatory pleading test is not applied where the defendant is charged with both the greater and lesser included offenses. (*Reed,* at pp. 1229–1231.) "Courts should consider the statutory elements and accusatory pleading in deciding whether a defendant received notice, and therefore may be convicted, of an *uncharged* crime, but only the statutory elements in deciding whether a defendant may be convicted of multiple *charged* crimes." (*Id*. at p. 1231.)

Even without the request of a party, the trial court has a duty to instruct the jury on the general principles of law relevant to the issues raised by the evidence, including instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present. (*People v. Smith*

(2013) 57 Cal.4th 232, 239.) "When the prosecution chooses to allege multiple ways of committing a greater offense in an accusatory pleading, the defendant may be convicted of the greater offense on any theory alleged ..., including a theory that necessarily subsumes a lesser offense." (*Id*. at p. 244.) There must be substantial evidence the defendant committed the lesser offense without also committing the greater. The instruction on a lesser included offense must be given so long as there is substantial evidence to conclude the defendant violated the lesser offense without also violating the greater offense. (*Id*. at pp. 244–245.)

Applying these principles, we initially note that because there were not multiple charges alleging different crimes for the same conduct, we are not bound by the statutory elements test. We also do not reach the People's theory of invited error. We therefore analyze this issue using the accusatory pleading test. Under the accusatory pleading test defendant had more than adequate notice he could be convicted of the lesser included offense of felony false imprisonment.

Detective Castaneda testified defendant used a gun to force the victim to travel with him and to detain him at two residences. Count 2 of the information alleged that on or about October 6, 2012, defendant willfully and unlawfully seized, confined, inveigled, enticed, decoyed, abducted, concealed, *kidnapped*, or carried away the victim with the intent to ransom or extort money or other valuable things from his relatives or friends. Among the theories alleged by the prosecution in the information, therefore, was that in violating section 209, subdivision (a), defendant kidnapped the victim. By definition, kidnapping (§ 207) involves use of force or fear. The force used against the victim need not be physical. The movement is forcible where it is accomplished through the giving of orders that the victim feels compelled to obey because he or she fears harm or injury from the accused. (*People v. Hovarter* (2008) 44 Cal.4th 983, 1017.)

Felony false imprisonment under section 237, subdivision (a) is accomplished if "the false imprisonment be effected by violence, menace, fraud, or deceit." False imprisonment is the lawful violation of the liberty of another, compelling the victim to go where he or she does not wish to go or remain where he or she does not wish to remain. The offense may be committed by acts, words, or both, and by operating on the victim's will by personal violence. The crime becomes a felony when it is "effected by violence, menace, fraud, or deceit." (§ 237, subd. (a); see *People v. Reed* (2000) 78 Cal.App.4th 274, 280.) Violence is effectuated by the exercise of physical force to restrain the victim over and above the force reasonably necessary to achieve restraint. Menace is defined as a threat of harm by word or act, express or implied. (*People v. Reed, supra*, at p. 280.)

Count 2 of the information alleged the kidnapping for ransom was effectuated, inter alia, by kidnapping, which requires use of force or fear. Violence as used in section 237, subdivision (a) requires violence or menace, which are equivalent to force or fear. The facts presented at the second preliminary hearing and count 2 of the information provided defendant with notice of the force or fear element of felony false imprisonment.

The evidence adduced at trial included the testimony of the victim and defendant that defendant was not involved in the incident. Defendant denied firing a gun or knowing the victim. The victim, however, gave a recorded statement to Detective Castaneda that soon after his initial encounter with defendant, defendant pulled a gun on him and continued to deploy it over the course of hours while he drove the victim to two different residences. The state of the evidence was that defendant was either not the perpetrator, or he violently abducted the victim and restrained him

against his will. There was no evidence of simple abduction without force or fear, or evidence that during the course of the encounter the victim felt free to leave thereby making the encounter consensual. [Fn.4]

> [Fn.4] The jury was instructed with CALCRIM No. 1240 that false imprisonment in violation of section 237, subdivision (a) accomplished by force or menace is a lesser crime to the crime alleged in count 2. The instruction included the definitions of unlawful restraint, violence, and menace. It also advised the jury the victim could not consent to the act.

Under the accusatory pleading test defendant had notice count 2 was accomplished with violence or fear. The jury was presented with evidence defendant could have committed the offense of felony false imprisonment, a lesser included offense of kidnapping for ransom as it was alleged in count 2 of the information. There was no evidence presented that defendant detained the victim during the course of the entire encounter, especially during the encounter at the North Norma property, by means other than force or fear, the legal equivalents of violence and menace as set forth in section 237. Because there was no evidence of misdemeanor false imprisonment, the trial court had no basis to instruct the jury on that theory. (*People v. Smith, supra*, 57 Cal.4th at pp. 244–245.)

The instructions given by the trial court on the lesser included offense of felony false imprisonment were correctly given. Trial counsel was not ineffective for failing to object to these instructions or for failing to request an instruction on misdemeanor false imprisonment.

Casillas, 2015 WL 8483864, at *5-9.

> ### a. Legal Standard

Effective assistance of counsel is guaranteed by the Due Process Clause of the Fourteenth Amendment. Evitts v. Lucey, 469 U.S. 387, 391-405 (1985). Claims of ineffective assistance of counsel are reviewed according to Strickland's two-pronged test. Strickland v. Washington, 466 U.S. 668, 687-88 (1984); Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989); United States v. Birtle, 792 F.2d 846, 847 (9th Cir.1986); see also Penson v. Ohio, 488 U.S. 75(1988) (holding that where a defendant has been actually or constructively denied the assistance of counsel altogether, the Strickland standard does not apply and prejudice is presumed; the implication is that Strickland does apply where counsel is present but ineffective).

To prevail, Petitioner must show two things. First, he must establish that counsel's deficient performance fell below an objective standard of reasonableness under prevailing professional norms. Strickland, 466 U.S. at 687-88. Second, Petitioner must establish that he suffered prejudice in that there was a reasonable probability that, but for counsel's unprofessional errors, he would have prevailed at trial. Id. at 694. A "reasonable probability" is a probability

14

sufficient to undermine confidence in the outcome of the trial. Id. The relevant inquiry is not what counsel could have done; rather, it is whether the choices made by counsel were reasonable. Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998).

With the passage of the AEDPA, habeas relief may only be granted if the state-court decision unreasonably applied this general Strickland standard for ineffective assistance. Knowles v. Mirzayance, 556 U.S. 111, 122 (2009). Accordingly, the question "is not whether a federal court believes the state court's determination under the Strickland standard "was incorrect but whether that determination was unreasonable–a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Knowles, 556 U.S. at 123. In effect, the AEDPA standard is "doubly deferential" because it requires that it be shown not only that the state court determination was erroneous, but also that it was objectively unreasonable. Yarborough v. Gentry, 540 U.S. 1, 5 (2003). Moreover, because the Strickland standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard. See Yarborough v. Alvarado, 541 U.S. 652, 664 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.")

### b. Analysis

Petitioner fails to show that counsel erred by failing to move to dismiss a charge of unlawful possession of a firearm. As discussed by the appellate court, the trial court's dismissal of count 4 was not pursuant to any of the reasons listed in section 1387. Therefore, the prosecution was not barred from re-charging Petitioner. The federal court is bound by the state court's interpretation of its own statute. See Bradshaw v. Richey, 546 U.S. 74, 76 (2005) ("[A] state court's interpretation of state law . . . binds a federal court sitting in habeas corpus"). Moreover, Petitioner was not re-charged with the same crime, because the state court found that count 4 as initially charged was not the same charge that was charged as count 4 of the amended complaint. The two counts referred to different dates and therefore different incidents. Thus, Petitioner fails to show that counsel erred. He also fails to show prejudice, because even if he had moved to dismiss count 4 in the amended complaint, the motion would have been denied.

15

Petitioner also fails to show that counsel erred by failing to object to the jury instruction on felony false imprisonment as a lesser included offense to kidnapping for ransom. The state court determined that under California law, the jury was properly instructed on felony false imprisonment. The appellate court noted that there was substantial evidence from which a jury could have found that Petitioner committed the crime of felony false imprisonment. The federal court is bound by the state court's determination. Moreover, as Respondent correctly points out, the Ninth Circuit has found that "the failure of a state court to instruct on a lesser offense in a non-capital case fails to present a federal constitutional question and will not be considered in a federal habeas corpus proceeding." Solis v. Garcia, 219 F.3d 922, 929 (9th Cir. 2000).

2. Substitution of Counsel

Petitioner next contends that the trial court erred by denying his motions to substitute counsel pursuant to People v. Marsden, 2 Cal.3d 118 (1970). He raised this claim on direct appeal as well. In the last reasoned decision, the Fifth DCA rejected the claim as follows:

> Defendant brought two *Marsden* motions prior to trial and two more *Marsden* motions after trial—one the day after the jury returned its verdict and the other just prior to sentencing. Defendant contends the *Marsden* hearings demonstrated his trial counsel was ineffective and had an irreconcilable conflict with defendant necessitating appointment of substitute counsel. Defendant further asserts the trial court should have appointed substitute counsel to investigate these claims and to determine whether to file a motion for new trial based on them. As we explain, the trial court conducted full *Marsden* hearings and vetted all of the defendant's grievances. We conclude defendant failed to make a colorable claim his trial counsel was ineffective, and the trial court did not err in denying defendant's request for substitute counsel.

> **A. First Pretrial Marsden Motion**

> On May 29, 2013, the trial court heard defendant's first *Marsden* motion which was based on a written motion filed by defendant contending counsel failed: to confer with defendant, subpoena witnesses favorable to the defense, investigate the case, prepare an affirmative defense at the preliminary hearing, secure expert witnesses, present crucial evidence, to declare a conflict with defendant because defense counsel acted as a surrogate prosecutor, and failed to give defendant his paperwork or preliminary hearing transcripts. At the hearing, defendant told the court his counsel walked away from defendant and told defendant he had no time to talk to defendant.

> Defense counsel, Mr. Revelo, responded he had met with defendant at the jail twice and was not present with defendant at arraignment. Revelo explained defendant's case had been dismissed once before and the defense had been provided with discovery, including the preliminary hearing transcript. Defendant indicated his frustration and counsel replied he "was customarily given clients that were

16

considered to be difficult." Revelo verified defendant's case had twice been dismissed.

Revelo explained that due to defendant's frustration, he gets into a mindset in which it is impossible to argue with him. When Revelo told defendant he was continuing with the case, defendant became angry. Also, defendant wanted a copy of the preliminary hearing transcript, which counsel does not provide to prevent a defendant from showing it to others, such as cellmates who then testify against counsel's clients. Revelo told the court he ultimately communicates with his clients and it seems to work out. Defendant was upset because as soon as the original charges were dismissed, they were reinstated and he did not understand why. He also wanted a section 995 motion to be filed.

Revelo further pointed out he wanted to continue the case but defendant did not want to enter into a time waiver. Revelo explained, however, he needed time to prepare for trial by talking to witnesses and to file at least one motion based on double jeopardy because the case had been dismissed twice. Defendant faced a sentence of seven years to life, and Revelo felt a responsibility to protect his client's rights.

The trial court found Revelo had a sound reason for not providing defendant with copies of the preliminary hearing transcript or the police reports. The court did not find a breakdown in the attorney-client relationship and denied the Marsden motion. The court told defendant Revelo would need time to file a motion based on double jeopardy and to contact witnesses and he should strongly consider waiving time.

### B. Second Pretrial Marsden Motion

The court conducted a second pretrial *Marsden* hearing on June 10, 2013. Defendant explained Phyllis Hix from Kernville had represented him earlier, but Revelo represented defendant at the second preliminary hearing on the refiled charges. [Fn.5] Defendant told the court he had insisted on his speedy trial rights and refused to waive time. Defendant told the court this was his second motion to relieve Revelo because he obviously had too many cases and no time for defendant's case. Defendant told the court he wanted a physical lineup, not just a photo lineup. Defendant said he thought Revelo had lost his ambition after the preliminary hearing.

> [Fn.5] In addition to Phyllis Hix, defendant had been represented by Roger Lampkin.

Defendant said he was not trying to pester Revelo, but Revelo would not communicate with him and had told him his former lawyer, Hix, was dying but this was not true. Revelo replied that defendant was referred to him because Revelo was becoming an expert in dealing with difficult clients. Revelo told defendant when he first met him that Revelo had been assigned to represent defendant because defendant was perceived as someone who was difficult to work with. Defendant had been twice escorted out of court because he was yelling and screaming. Revelo was not sure what was wrong with defendant but speculated his understanding of the case was "clouded by perhaps some mental condition." Revelo thought defendant was depressed and suffered from anxiety.

Revelo was delayed in working on defendant's case because he had been in trial continuously on five different cases since December 7, 2012. Two of those cases lasted six weeks. As for the motion, defendant would not waive his speedy trial right for Revelo to have time to prepare the motion. Defendant also had many other

17

motions he wanted to file but Revelo could not convince him to do otherwise.

Revelo was concerned defendant did not seem to understand that if Revelo was relieved as counsel, the proceedings would be delayed while a new attorney investigated the case and reviewed the file. Revelo described defendant's conduct as "acts of desperation" because defendant did not believe he should be in custody. Revelo described defendant as having "frantic moods" where he would cry and had to be removed from the courtroom. Revelo told the court he should see "if there is, in fact, a mental health issue that is making it impossible for him to collaborate with counsel." Revelo further observed, "At this point I don't see that, but I think that I'm still unclear as to whether or not this is an issue covered in [section] 1368."

Revelo explained he did not seek a physical lineup because he believed the photographic lineup was 100 percent positive and he was going to explore that point at trial. Revelo noted the physical identification of the perpetrator was different from defendant's appearance in the photographic identification. For tactical reasons, Revelo did not want to have a physical lineup that turned out to be a better identification. Revelo also believed that with more time passing between the photographic lineup and trial, it was possible the victim would not make a positive identification of defendant.

Revelo did not intend to file a suppression motion because there was no evidence to suppress. A prosecutor had mentioned to Revelo that defendant's former counsel was dying and Revelo mentioned it to defendant. Revelo also intended to file a motion to dismiss the case pursuant to section 995 because it had been filed twice before. Defendant reviewed the procedural history of the case with the court and complained it had been filed again by the prosecutor. A lengthy exchange then occurred between the trial court and Revelo concerning the pros and cons of having a physical lineup. Revelo concluded it was a bad idea but he would bring a motion to do so if defendant sought it. The court denied the *Marsden* motion.

## C. *Marsden* Motion After Jury Verdict

On August 28, 2013, the day after the jury reached its verdict, defendant brought a *Marsden* motion reiterating most of his grievances against Revelo lodged during the first two *Marsden* hearings. Defendant complained his case had been dismissed before. In addition, Revelo had a heavy caseload, had failed to file written motions, and only saw defendant twice in over seven months. Defendant believed the victim's identification of him was tainted.

Defendant noted he never waived time though there were complications in his case. Defendant alleged the defense investigator threatened him, there was no communication between counsel and defendant, and Revelo repeatedly failed to represent him. Defendant claimed Revelo was overworked and fell asleep twice during trial. Defendant argued the police report indicated the assailant was a White person and this was not brought to the jury's attention.

Defendant complained gas stations and fast food restaurants with video cameras were not investigated by Revelo for video footage that would have cleared defendant. Defendant was unhappy Revelo made stipulations to the jury. Because defendant was not familiar with Ridgecrest, he needed a realtor to guide him step-by-step through his locations the day of the incident in order to corroborate his story. Defendant complained that when he wanted to talk about the motions he sought to have Revelo file for him, the trial court would refer defendant back to his attorney. The court explained it was unethical for the court to listen to the substance of

motions that were to be brought to him or to advise defendant on whether to file such motions.

Defendant asserted that even while in court, Revelo would not talk to him. Defendant stated Revelo kept insisting the People had no case against him. The court noted that after 30 minutes of talking, defendant had said nothing new in nearly 10 minutes, was venting at Revelo, and the court was not going to permit defendant to continue doing so. Defendant felt Revelo failed to file pretrial motions, including a suppression motion and one for vindictive prosecution.

Revelo responded to defendant's motion by first pointing out that defendant had two prior attorneys who indicated he could be a problem. Revelo noted that during his testimony defendant mentioned taking psychotropic medication, this was the first time Revelo had heard this information, and it would have been nice for Revelo to have heard this earlier. Revelo observed that among the things defendant did to "bury" himself in this case was to have a kite in his pocket. Revelo had asked defendant if the GPS evidence would place the victim at the Oasis property and defendant assured him it would not, but that was exactly what the GPS evidence confirmed.

Revelo's investigator talked to jurors after they reached their verdicts and they told the investigator the GPS evidence from Fern's monitor was key evidence leading to defendant's guilt. The GPS evidence also placed Fern at the Coso address, a difficult fact for Revelo to refute. Revelo could not obtain video footage from the gas station or fast food restaurants because months had passed prior to Revelo taking on the case. Revelo asked defendant to waive time, defendant refused, Revelo did what defendant wanted, and the result was defendant's conviction. Revelo pointed out that the "jail-house attorneys" defendant consulted only made Revelo's job more difficult. Revelo referred to this case as a textbook example of an attorney asking the client for information and getting lies.

Revelo explained he was not going to subpoena the GPS evidence. Defendant would not waive time in order to file motions. The section 995 motion was more complicated and Revelo did not have enough time to prepare it. When Revelo asked for more time, defendant told him no.

In denying the *Marsden* motion, the trial court found no ineffective assistance of counsel and no breakdown in the communication between attorney and client. In discussing the section 995 motion that was brought in the original action, the court noted it had been brought as to the kidnapping for ransom allegation. The court found that Revelo was not ineffective for failing to file other motions, especially when defendant was insistent on not waiving time for Revelo to prepare the motions. The court noted an attorney could not be expected to do the impossible.

The court also noted that from its perspective hearing all the evidence, Revelo effectively presented a defense. The court observed that Revelo's defense led to an acquittal of kidnapping for ransom, which carried a life sentence, and resulted in a conviction for false imprisonment with a sentence of something like eight months. The court found Revelo's representation to be effective. The court further observed it permits trial counsel to send communications using their cell phones if it assists them in their work, and Revelo's use of his phone during trial did not establish counsel was ineffective. The court found that on no occasion during trial did Revelo appear to be asleep.

## D. Final *Marsden* Motion

On October 25, 2013, the trial court heard defendant's motion to substitute his trial attorney and for substituted counsel to investigate grounds to file a motion for a new trial based on ineffective assistance of counsel. Defendant asserted he had a mental health condition and the medication he took did not improve the immense emotional and psychological strain he was under during trial. This led to him have racing thoughts and to hear voices in his head. Defendant claimed Revelo was retaliating against him for complaining to the California State Bar, there was no evidence defendant had possessed a gun or ammunition, and Revelo was ineffective for failing to file motions from the first day he represented defendant. Defendant asserted Revelo should have filed a section 1368 motion for a competency hearing.

Defendant told the court his diagnosis for schizophrenia was newly discovered evidence. When asked by the court how this was a newly discovered situation if defendant had known he had this condition for a long time, defendant replied that Revelo did not know about the condition.

Defendant claimed Revelo disrespected him with slander, and he attached letters from himself and two other prisoners complaining to the State Bar of California concerning Revelo's conduct. Defendant said Revelo was texting on his phone throughout the trial and maliciously slandered defendant to other inmates. Defendant had a realtor working with him to retain another attorney. According to defendant, Revelo was merely a surrogate for the prosecutor.

Defendant thought Revelo should have investigated witnesses who lived near the shooting. Defendant thought Revelo should have filed a section 995 motion to challenge the sufficiency of the evidence presented at the preliminary hearing and a motion to compel a lineup. Defendant acknowledged he had a lineup in which the victim failed to identify him on June 24, 2013. Defendant wanted the photographic lineup suppressed. The trial court explained to defendant that a lineup is only suppressed when it is constitutionally unlawful for being unduly suggestive.

In response to defendant's allegations of misrepresentation, misconduct, and ineffective representation, Revelo told the court defendant never said anything to him about hearing voices, having racing thoughts, or taking psychotropic medication. Revelo explained defendant was "extremely coherent" and "very convincing" when he wants to be. But when he talks about his mental health issues, defendant begins to stutter and claims his thoughts are racing. Revelo thought defendant may have thought this out a long time ago as an example of newly discovered information and strategically withheld key information from his counsel in order to use it last minute.

Revelo observed most defense attorneys in Kern County have gone to trial on competency hearings on a showing less than that made by defendant. Revelo said he was currently engaged in such a trial. Revelo never saw any documentation to verify defendant was schizophrenic, though defendant indicated he just obtained this documentation.

Revelo did not believe he should have filed a section 1368 motion challenging defendant's competency when he had no information or basis to do so. Although defendant had been "a little bit of a problem client," Revelo had many of those and this representation was nothing new. Revelo reiterated his point from earlier *Marsden* hearings that he did not have time to file motions because defendant would not enter into time waivers to give Revelo the opportunity to do so. Revelo stated

defendant had been acquitted of kidnapping for ransom, and filing a section 995 motion on that count would not have changed the outcome of the case.

Revelo noted that during the physical lineup conducted, defendant tried to wear glasses, which he does not wear, but the guards told him to take them off. The victim did not identify defendant during that lineup and during his testimony repeatedly described another assailant.

Revelo and his investigator had both asked defendant about whether the GPS readings would conform to Fern's earlier account of where he had been. Defendant told them it would not. Revelo adamantly denied assisting the prosecutor and said he never divulged any tactics to the prosecutor, and would never do so. The GPS evidence was presented to the jury and it established defendant's guilt to the jury. The prosecutor assisted the defense in obtaining the GPS evidence. Revelo did not want to introduce the GPS evidence if it would lead to defendant's conviction, but defendant wanted the evidence introduced. Revelo believed defendant was calculating his mental health claim and the last minute introduction of the GPS evidence to lead the court to make the wrong conclusions.

Revelo explained that he closes his eyes during trial to "look [like] a very convincing sleeping attorney" and then jumps out of his chair at any time it is necessary. He uses this device to cue the jury that a point is not important. Revelo said he also yawns to get jurors to do so, much to the horror and anger of prosecutors. He employs this theater to defend his clients. Revelo denied ever sleeping during defendant's trial. The trial court gave defendant an opportunity to respond to Revelo's remarks, but defendant reiterated points he had made earlier in this and previous *Marsden* hearings.

The trial court initially noted that much of what defendant presented had been brought before the court during the previous *Marsden* hearing. The court described defendant's tactic since the jury's verdict as "a full scale nonstop attack on Mr. Revelo as being the party responsible for the verdict." The court found no credible evidence that Revelo shared trial tactics with the prosecutor, violated the attorney-client privilege, or became a surrogate prosecutor because defendant filed a complaint with the state bar.

The court found Revelo vigorously represented defendant at trial and did so effectively even when obstacles like the GPS evidence were thrown in his path. The court noted the jury acquitted defendant of the section 209 kidnapping for ransom charge, which carries a life sentence. The court found that although there would have been a basis for a section 995 motion on the section 209 allegation, the failure to file it resulted in no prejudice to defendant.

The court observed Revelo's trial tactics created confusion for the jury concerning the importance of the GPS records and whether they were significant. The court found Revelo was both effective and far from being a surrogate prosecutor. The court noted Revelo continued to do a zealous and effective job on defendant's behalf despite the fact the relationship between attorney and client was not the best the court had observed.

The court found no basis to grant defendant's motion for a new trial based on insufficiency of the evidence. The court also found no basis for granting the new trial motion based on ineffective assistance of counsel because Revelo permitted defendant to testify. The court stated defendant had an absolute constitutional right to testify. The court observed that Revelo had not slept during trial.

The court noted it seriously considered defendant's assertion of newly discovered evidence based on a mental health condition. The court had the opportunity to personally observe defendant more extensively than in other cases because the court saw defendant during trial and during the *Marsden* hearings. The court was not sure if defendant in fact had a mental health condition, assumed for the record that he did, and found defendant was not incompetent to stand trial. The court noted a section 1368 motion cannot be brought merely because a defendant has mental health issues. Such a motion should only be brought where there is substantial evidence an individual is not competent to stand trial. The court stated it had observed no evidence during trial to support defendant's current claim of incompetency and Revelo was not ineffective for failing to raise defendant's competency as an issue.

The court found no basis to defendant's assertion that other witnesses should have been called or to his claim that a new lineup should have been made. The court stated the latter point was especially true because defendant had already undergone an in-person lineup and the results were favorable to him. The court explained it was vigilant for any sign of a breakdown in the attorney-client relationship that could lead to ineffective assistance of counsel and did not see that happening.

The court found no breakdown in communication between attorney and client that resulted in ineffective representation, and Revelo's continued representation would not impair defendant's right to effective assistance of counsel in the remainder of the proceedings. After the *Marsden* hearing, Revelo made an oral motion to suspend the proceedings pursuant to section 1368 to determine defendant's competency. The trial court denied the motion.

### E. Standard for Appointing Conflict Counsel

On appeal, defendant contends Revelo essentially stated defendant was malingering concerning his mental health during the final *Marsden* hearing, but during the second pretrial hearing Revelo inconsistently expressed doubt concerning defendant's mental health status. Defendant argues that during the final hearing, Revelo gratuitously revealed his confidential communication with defendant regarding defendant's demand for introduction of the GPS evidence, which did not respond to his own ineffectiveness but to impress to the court defendant lied to his counsel. According to defendant, Revelo did this to remain employed on the case.

Defendant challenges Revelo's failure to file pretrial motions based on time constraints due to defendant's failure to enter into time waivers. Defendant argues instead that Revelo was too busy on other cases. Also, Revelo allegedly failed to call defense witnesses. Defendant characterizes all of the alleged deficiencies in Revelo's representation as ineffective assistance of trial counsel and a conflict of interest between attorney and client.

When a defendant seeks to substitute his or her appointed counsel and asserts inadequate representation, the trial court must permit the defendant to explain the basis of that contention and to relate specific instances of counsel's alleged inadequate performance. A defendant is entitled to relief if the record clearly demonstrates the appointed attorney fails to provide adequate representation or that the defendant and counsel have become embroiled in such an irreconcilable conflict ineffective representation is likely to result. The decision whether to grant a substitution of counsel is within the discretion of the trial court. Appellate courts will not find an abuse of that discretion unless the failure to substitute appointed

counsel would substantially impair the defendant's right to effective assistance of counsel. (*People v. Roldan* (2005) 35 Cal.4th 646, 681, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) Where the complaints of counsel's ineffectiveness involve tactical disagreements, we do not find *Marsden* error. (*People v. Dickey* (2005) 35 Cal.4th 884, 922.)

If the defendant's claim of inadequate representation relates to courtroom events the trial court observed, the court will generally be able to resolve the new trial motion without appointing new counsel. If the defendant's assertion of inadequate representation relates to matters that occurred outside the courtroom, and the defendant makes a so-called colorable claim of inadequacy of counsel, the trial court may, in its discretion, appoint new counsel to assist the defendant in moving for a new trial. (*People v. Smith* (1993) 6 Cal.4th 684, 692–693.)

To the extent there is a credibility question between the representations of a defendant and his or her counsel, the trial court is entitled to accept counsel's explanations. Heated exchanges between the attorney and defendant are not enough by themselves to warrant substitution of counsel absent an irreconcilable conflict. "Moreover, a defendant may not force the substitution of counsel by his own conduct that manufactures a conflict." (*People v. Smith, supra*, 6 Cal.4th at p. 696.)

## F. Competency to Stand Trial

Due process is violated when a mentally incompetent person undergoes a criminal trial. A defendant is not incompetent if he or she can understand the nature of the legal proceedings and assist counsel in conducting a defense in a rational manner. A defendant is presumed competent unless the contrary is proven by a preponderance of the evidence by the party challenging his or her competency. (*People v. Blacksher* (2011) 52 Cal.4th 769, 797; *People v. Kaplan* (2007) 149 Cal.App.4th 372, 382–383.)

Evidence of incompetence may emanate from several sources, including the defendant's demeanor, irrational behavior, and prior mental evaluations. A reviewing court gives great deference to the trial court's decision whether to hold a competency hearing. When there is less than substantial evidence, the trial court still has discretion to order a competency hearing. The trial court's decision whether to order a competency hearing is given great deference because the trial court has had the opportunity to observe the defendant during trial. (*People v. Kaplan, supra*, 149 Cal.App.4th at p. 383.)

The People argue that Revelo did not identify a mental health condition that would give rise to a section 1368 proceeding during the *Marsden* hearing on June 10, 2013. In that hearing, Revelo informed the court that defendant's mental status indicated potential mental illness due to depression, anxiety, and what Revelo called frantic moods, but did not rise at that time to the level of doubt as to defendant's competency to stand trial.

Revelo gave the court a frank description of a client who alleged mental health symptoms in order to create the appearance of new evidence. What Revelo described during the second *Marsden* hearing in June 2013 was depression and some frantic moods by the defendant. Importantly, Revelo did not describe behavior by the defendant that would lead him to file a section 1368 motion to suspend the proceedings. For instance, neither defendant nor Revelo indicated during any of the *Marsden* hearings that they had difficulty communicating with or understanding each other. The fact Revelo saw his client in a distraught mood during pretrial

proceedings would not, by itself, have been an indication he needed to file a section 1368 motion.

Revelo expressed some doubt during the hearing over whether he would need to file a motion pursuant to section 1368, but ultimately decided not to do so. During the second posttrial *Marsden* hearing, Revelo informed the court defendant made reference to taking medication for schizophrenia for the first time during the trial.

Revelo said he saw no prior behavior to corroborate defendant's assertions of racing thoughts and hearing voices and defendant never informed counsel of this condition. Revelo noticed defendant was coherent and convincing when he wanted to be, but would change his behavior when he talked about his mental health. Revelo believed defendant waited to raise this point until after trial to create a claim of newly discovered evidence and had formed this as a tactic. Revelo described a defendant who apparently turned his symptoms on and off like a faucet.

The trial court shared Revelo's observation that defendant demonstrated no behavior during trial warranting a suspension of proceedings pursuant to section 1368. There is no indication of any behavior by defendant before or during trial, or during the four *Marsden* hearings, to support his assertion of incompetency due to mental illness.

A defendant who has developed a sophisticated strategy such as this is displaying a great deal of forethought; the opposite of someone who is legally incompetent to stand trial because he or she does not understand the nature of the charges or proceedings. Defendant failed to speak to Revelo concerning his alleged mental illness until they were in the final Marsden hearing just prior to sentencing. Furthermore, defendant did not raise his mental competence during the first posttrial *Marsden* hearing immediately after the conclusion of jury deliberations on August 28, 2013. Under these circumstances the trial court could reasonably conclude defendant's assertion of incompetency was feigned and that he sought to inject error into the proceedings. (*People v. Smith, supra*, 6 Cal.4th at p. 696; see *People v. Roldan, supra*, 35 Cal.4th at p 682.) The trial court was entitled to weigh defendant's credibility, as well as that of trial counsel. The trial court's finding defendant was competent was supported by substantial evidence.

In *Smith*, the Supreme Court required the defendant show only a colorable claim of inadequacy of counsel. (*People v. Smith, supra*, 6 Cal.4th at p. 693.) The question we resolve is whether defendant made a colorable claim Revelo inadequately represented him for failing to have a hearing before or after trial to determine his competency. Based on the extensive *Marsden* hearings conducted before and after trial, we conclude defendant has not made a colorable claim of inadequate representation by his trial counsel based on defendant's belated assertions of his own incompetency. [Fn.6]

> [Fn.6] We are aware that after the fourth Marsden hearing, Revelo made a motion to suspend the proceedings pursuant to section 1368. Based on a record in which trial counsel has painted a picture of a very thoughtful and engaged client, we do not find Revelo's motion to be a concession his client has made a colorable claim of inadequate representation. The motion was likely made by Revelo out of an abundance of caution.

**G. Other Alleged Conflicts Between Attorney and Client**

Defendant raises other issues on appeal involving alleged conflicts with his trial

counsel. We note Revelo was honest during the *Marsden* hearings about defendant being a difficult client. Revelo pointed out his willingness to always work with such clients. Neither Revelo nor defendant suggested a breakdown in basic communication or an inability to work together during trial. For instance, Revelo was not certain the defense should seek the GPS evidence, but did so at defendant's insistence this evidence was exculpatory. Revelo acceded to his client's wishes. The People accurately argue this is an example showing there was not an irreconcilable conflict between attorney and client.

We also reject defendant's argument that in discussing this point during the *Marsden* hearings, Revelo violated defendant's confidences. The very purpose of the in camera procedure of a *Marsden* hearing is for defendants and counsel to confidentially explore potential conflicts between them. Disclosure of otherwise privileged information in the attorney-client relationship is a common result. (See *People v. Knight* (2015) 239 Cal.App.4th 1, 6–8 [defendants entitled to use immunity for facts disclosed in *Marsden* hearing, citing *People v. Dennis* (1986) 177 Cal.App.3d 863, 874–876].)

Defendant argued there were time constraints on Revelo creating a conflict of interest. During the *Marsden* hearings, however, Revelo explained defendant made it difficult to bring pretrial motions because he would not permit time waivers. This is another example of defendant injecting error into the proceedings by arguably unreasonable conduct before trial. (*People v. Smith, supra*, 6 Cal.4th at p. 696; see *People v. Roldan, supra*, 35 Cal.4th at p. 682.) Furthermore, the trial court was entitled to accept Revelo's representations over those made by defendant. (*Smith, supra*, at p. 696.)

Defendant further complains Revelo failed to: investigate the case, consult with defendant's prior attorney, and file pretrial motions, especially a section 995 motion for being a felon in possession of a firearm, which was twice dismissed. All of these claims are either speculative or, as in the case of the section 995 motion, not legally viable as discussed in part I, *ante*. Again, to the extent there is a credibility question between the representations of a defendant and his or her counsel, the trial court is entitled to accept counsel's explanations. (*People v. Smith, supra*, 6 Cal.4th at p. 696.)

Through a very selective reading of the record—and failing to give any deference to trial counsel's explanations or the trial court's observations and factual findings— appellate counsel has attempted to create a picture of Revelo as ineffective and in irreconcilable conflict with his client. We find this portrait entirely at odds with what occurred at trial and during the extensive and exhaustive *Marsden* hearings. Revelo worked diligently on a difficult case made more difficult by defendant's apparently deliberate actions to inject error into the proceedings. He maintained his professionalism, provided defendant with effective assistance of counsel, and effectively communicated with a difficult client.

Defendant was given ample opportunity during all four *Marsden* hearings to explain the reasons for his request for new counsel. (*People v. Diaz* (1992) 3 Cal.4th 495, 574–575; *People v. Vera* (2004) 122 Cal.App.4th 970, 979.) We conclude the trial court did not err in denying defendant's motion for substitute counsel.

Casillas, 2015 WL 8483864, at *9-18.

25

*a. Legal Standard and Analysis*

Petitioner challenges the trial court's application of <u>People v. Marsden</u>, 2 Cal.3d 118, 84 Cal.Rptr. 156, 465 P.2d 44 (1970), in four <u>Marsden</u> hearings. Generally, the interpretation and application of state laws are not cognizable on federal habeas. <u>Estelle v. McGuire</u>, 502 U.S. 62, 67 (1991) (quoting <u>Lewis v. Jeffers</u>, 497 U.S. 764, 780 (1990)) ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.' "); <u>Gilmore v. Taylor</u>, 508 U.S. 333, 348-49 (1993) (O'Connor, J., concurring) ("mere error of state law, one that does not rise to the level of a constitutional violation, may not be corrected on federal habeas"); <u>Sawyer v. Smith</u>, 497 U.S. 227, 239 (1990) (quoting <u>Dugger v. Adams</u>, 489 U.S. 401, 409 (1989) ( "[T]he availability of a claim under state law does not of itself establish that a claim was available under the United States Constitution"). Petitioner contends the trial court erred in the manner in which it conducted the <u>Marsden</u> hearings, and that the appellate court's approval of the trial court's determinations was erroneous. To the extent the claim concerns the interpretation and application of state law, it is not cognizable on federal habeas review. <u>Pulley v. Harris</u>, 465 U.S. 37, 41 (1984) ("A federal court may not issue the writ on the basis of a perceived error of state law"). Moreover, federal courts are bound by state court rulings on questions of state law. <u>Oxborrow v. Eikenberry</u>, 877 F.2d 1395, 1399 (9th Cir.1989).

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to ... have the Assistance of Counsel for his defense." U.S. Const. amend. VI. The Ninth Circuit has stated that the denial of a <u>Marsden</u> motion to substitute counsel can implicate a criminal defendant's Sixth Amendment right to counsel and is properly considered in federal habeas corpus, <u>Bland v. California Dep't of Corrections</u>, 20 F.3d 1469, 1475 (9th Cir.1994), and the Sixth Amendment requires an inquiry into the grounds for a motion to remove counsel. <u>Schell v. Witek</u>, 218 F.3d 1017, 1025 (9th Cir.2000). However, as noted by Respondent, there is no direct precedent from the Supreme Court which holds that a denial of a motion to substitute counsel can be unconstitutional. "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court." <u>Knowles</u>, 556 U.S. at 122. Therefore, Petitioner's allegation

that the trial court abused its discretion in denying his motion to remove counsel does not present

a cognizable claim on habeas review.

Even if the Court considered the claim under Ninth Circuit caselaw, it is without merit.

An indigent defendant, while entitled to appointed counsel, is not constitutionally entitled to

appointed counsel of choice. Hendricks v. Zenon, 993 F.2d 664, 671 (9th Cir. 1993). The

Supreme Court has "reject[ed] the claim that the Sixth Amendment guarantees a 'meaningful

relationship' between an accused and his counsel. Morris v. Slappy, 461 U.S. 1, 13-14 (1983).

The Ninth Circuit has found that a trial court's refusal to allow substitution of counsel can violate

a defendant's Sixth Amendment right to counsel if the defendant and his attorney have an

"irreconcilable conflict." Stenson v. Lambert, 504 F.3d 873, 886 (9th Cir. 2007), *cert. denied*, 523

U.S. 1008 (2008). This level of conflict exists only if communication has so broken down that it

prevents the effective assistance of counsel. Id. at 886; Schell, 218 F.3d at 1026.

In this case, the trial court held a Marsden hearing in each of the four instances in which

Petitioner sought substitute counsel. The trial court gave Petitioner the opportunity to explain his

reasons for wanting substitute counsel. The trial court then asked counsel to address the alleged

deficiencies and satisfied itself that counsel's preparation for and representation at trial were more

than adequate.  The trial court noted that counsel maintained his professionalism, provided

defendant with effective assistance, and effectively communicated with him despite Petitioner

being a difficult client. The record established that there was no breakdown of attorney-client

communications; rather, petitioner and his attorney had disagreements over trial tactics and

whether investigation into a particular matter was warranted. In some instances, counsel acceded

to Petitioner's requests such as with the evidence of GPS location data. In any case,

"[d]isagreements over strategical or tactical decisions do not rise to [the] level of a complete

breakdown in communication" that amounts to a Sixth Amendment violation. Stenson v.

Lambert, 504 F.3d at 886 (citing Schell, 218 F.3d at 1026).  The factual record developed was

sufficient to allow the court to make an informed decision that petitioner's claim of conflict did

not require substitute counsel. See Stenson, 504 F.3d at 887 (inquiry was adequate when court

determined lines of communication were open and counsel was competent); United States v.

Prime, 431 F.3d 1147, 1155 (9th Cir.2005) (inquiry was adequate where defendant 'was given the opportunity to express whatever concerns he had, and the court inquired as to [defense attorney's] commitment to the case and his perspective on the degree of communication.")

In conclusion, it is clear from the record that the appellate court's decision was not contrary to or an unreasonable application of Supreme Court precedent. Further, there was no evidence of a complete collapse in the attorney-client relationship. The claim should be rejected.

### 3. Ineffective Assistance of Counsel

Next, Petitioner raises multiple claims of ineffective assistance of counsel. He asserts that defense counsel: 1) failed to raise the right of confrontation and challenge false testimonial hearsay; 2) failed to properly communicate a 6 year plea offer; 3) failed to consult and retain an expert in the field of forensics and ballistics to discredit the victim's allegations; 4) failed to interview or call supporting defense witnesses; 5) failed to investigate the facts and circumstantial evidence; 6) failed to bring a meritorious motion to dismiss pursuant to Cal. Penal Code § 995; 7) failed to meet with Petitioner to establish a working attorney-client relationship; and 8) failed to personally keep Petitioner updated on significant and meaningful developments in the case. This claim was raised in a habeas petition to the California Supreme Court, and the petition was summarily denied. (Doc. 61-26.) In such a case as this where the state court decided the petitioner's claims on the merits but provided no reasoning for its decision, the federal habeas court conducts "an independent review of the record . . . to determine whether the state court [was objectively unreasonable] in its application of controlling federal law." Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2002). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

*a. Legal Standard*

As fully set forth in Ground One, *supra*, in order to demonstrate ineffective assistance of counsel, Petitioner must establish that counsel's deficient performance fell below an objective standard of reasonableness, and as a result, Petitioner suffered prejudice in that there was a reasonable probability that, but for counsel's unprofessional errors, he would have prevailed. Strickland, 466 U.S. at 694. The relevant inquiry is not what counsel could have done; rather, it is

28

whether the choices made by counsel were reasonable.  <u>Babbitt,</u> 151 F.3d at 1173.

   b.  *Analysis – Failure to Raise Right of Confrontation and Challenge False Hearsay*
       *Testimony*

Petitioner claims defense counsel failed to raise Petitioner's right to confrontation and challenge false hearsay testimony.  He points to Detective Castaneda's testimony concerning Dolcinea Robinson who told him that she had been hanging around with Petitioner for two weeks prior to the incident and that she had stolen Petitioner's drugs. Petitioner claims her statements were false and defense counsel rendered ineffective assistance in failing to challenge her statements. However, as Respondent correctly notes, it was defense counsel who introduced her statements to Detective Castaneda, not the prosecutor. In addition, it was defense counsel who pointed out that her statements could not be true since Petitioner was in custody at the time. (Doc. 61-11 at 64.)  Counsel may have reasonably believed that introducing her statements and then pointing out their inherent falsity would have cast doubt on the credibility of those witnesses testifying that Petitioner was the perpetrator.  In any case, Petitioner cannot demonstrate prejudice because the prosecution did not rely on those statements to secure a conviction.

   c.  *Analysis – Failure to Communicate Plea Deal*

Petitioner next alleges that defense counsel failed to communicate a six-year plea deal that was extended by the Kern County District Attorney's Office prior to the second preliminary hearing. As correctly stated by Respondent, a minute order dated March 19, 2013, reflects that Petitioner was present with his attorney at a preliminary hearing where Petitioner was offered a plea bargain to plead to count 1 and admit two priors in return for a six-year sentence, but rejected it. (Doc. 61-1 at 30.) There is no basis to the claim.

   d.  *Analysis – Failure to Consult and Retain Experts in Fields of Forensics, Ballistics,*
       *and GPS Monitoring Technology*

Petitioner contends that defense counsel rendered ineffective assistance by failing to consult and ultimately retain an expert in the fields of forensics, ballistics and GPS monitoring or tracking technology to discredit the allegations in the case made by the victim. He claims that had defense counsel consulted and retained an expert in forensics and ballistics, the casings could have been analyzed for latent fingerprints and the weakest areas in the physical evidence could

29

have been exposed. He states that the victim had been wearing an ankle monitor at the time of the offense, and had defense counsel obtained GPS tracking evidence for the days of October 5-7 rather than just for the date of October 6, he could have shown a pattern in the victim's movements.

In this case, no ballistics evidence was used nor were any bullet casings tested. Thus, there was no ballistic or forensic evidence for defense counsel to challenge. Petitioner's contention that testing would have been beneficial to the defense is mere speculation. James v. Borg, 24 F.3d 20, 26 (9th Cir.1994). He does not present any evidence in support of this contention. In fact, the casings were discovered four days after the shooting and they had been discovered "in the dirt, . . . exposed to the elements . . . the dirt . . . and the heat." (Doc. 61-11 at 73.) Defense counsel could reasonably have concluded that testing would have been pointless, or even detrimental to his client had prints been discovered and found to match Petitioner. Accordingly, Petitioner fails to show that counsel erred or that he was prejudiced in any manner.

Likewise, Petitioner's claim that counsel should have retained a GPS tracking expert to show a possible margin of error of 20 to 50 feet is meritless. Even if counsel had retained such an expert and the expert had testified that GPS tracking has a margin of error of 20 to 50 feet, the victim was still within the area he had stated. Moreover, at all relevant times, the tracking information corresponded to the movements he had described. Counsel could have reasonably determined that expert testimony pointing out such a small margin of error would have only strengthened the prosecution's case. In addition, Petitioner cannot demonstrate prejudice since the jury was aware that GPS tracking information had a margin of error. As noted by Respondent, an officer at trial testified that "there is a degree of accuracy sometimes that occurs on [GPS] devices. Usually it's within three meters so it could be . . . anywhere around there." (Doc. 61-12 at 22-23.) Petitioner fails to show that counsel erred, or that he suffered any prejudice.

*e. Analysis – Failure to Interview and Call Defense Witnesses*

Next, Petitioner claims defense counsel was ineffective in failing to interview and call any of seventeen potential defense witnesses. He states counsel should have attempted to speak with

them "in order to find out exactly what specific information they could provide, and if that information could be relevant and helpful to the defense's position." (Doc. 30 at 119.) Petitioner fails to present sufficient facts or evidentiary support to rebut the presumption that counsel rendered effective assistance. Petitioner's contention that these seventeen potential witnesses could have helped the defense is pure conjecture. To carry his burden, Petitioner "must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense." Day v. Quarterman, 566 F.3d 527, 538 (5th Cir. 2009). Petitioner has failed to do so by providing any affidavits or declarations from the putative witnesses. Moreover, counsel's reasons not to call these witnesses are completely unknown. It is unknown whether counsel attempted to contact them, what the results were, and what counsel thought about them. Without any supporting evidence, Petitioner's allegation is pure speculation.

Petitioner also faults counsel for failing to call five potential witnesses who were willing to testify concerning the .22-caliber gun, as well as Petitioner's work schedule. However, the charge concerning Petitioner's possession of the .22-caliber firearm was dropped. Knowledge of Petitioner's work schedule would have done nothing to contradict the evidence that Petitioner was identified as the perpetrator. Thus, Petitioner cannot show prejudice.

### f. Analysis – Failure to Investigate

Petitioner claims defense counsel was ineffective in failing to investigate the facts and circumstantial evidence in the case to fully prepare for trial. He contends counsel could have retained an investigator to assist him in contacting witnesses for the defense. In particular, Petitioner points to the victim's first statement to officers in which he stated that the suspect had a spiderweb tattoo on his forehead. In subsequent statements, the victim denied the suspect had a spiderweb tattoo. He claims defense counsel failed to properly investigate the case by locating a white male with a spiderweb tattoo on his face.

Petitioner fails to show that counsel acted unreasonably. Detective Castaneda testified that it would be "next to impossible" to narrow down a search for an individual with a spiderweb tattoo. (Doc. 61-11 at 48.) In addition, the victim's statements concerning the tattooed individual

shared little in common with the actions of which Petitioner was accused. Defense counsel could reasonably have determined that locating this individual would require too much effort when those efforts could better be focused on more important issues.

In any case, Petitioner fails to show prejudice. Even if defense counsel had located such an individual, it would have done nothing to challenge the evidence against Petitioner. The victim's description of events was detailed and corresponded with the GPS tracking information. (Doc. 60-1 at 5.) When the victim was shown a photo lineup, he became emotional and began to tear up. (Doc. 60-1 at 4.) The victim circled Petitioner's photograph and signed it. (Doc. 60-1 at 4.) Physical and eyewitness testimony further corroborated the victim's account. (Doc. 60-1 at 4-5.) Finally, a note was discovered in Petitioner's possession during a bus transport of inmates including Petitioner and the victim. (Doc. 60-1 at 5.) The note said: "Hey bro. I need you to write me a letter saying that . . . Det Castaneda made you say all that, that he coered [sic] and intimidated you." (Doc. 60-1 at 5.) Petitioner's name, booking number, and pod number were written on the back of the note with the message, "we will get paid" with two dollar signs. (Doc. 60-1 at 5.) There is no reasonable probability that the outcome would have been different if defense counsel had attempted to locate the tattooed individual.

### g. Analysis – Failure to File Motion to Dismiss Count 2

Next, Petitioner raises several claims concerning defense counsel's actions with respect to count 2. He first faults counsel for failing to move to dismiss count 2, kidnaping for ransom, when there was no evidence to support the charge at the preliminary hearing. He further claims that if counsel had moved to dismiss count 2, he would not have been found guilty of the lesser included offense of felony false imprisonment. Finally, Petitioner contends counsel failed to object to an instruction on felony false imprisonment. None of the arguments merit relief.

Respondent is correct that Petitioner is not in custody to challenge the kidnaping charge since he was not convicted on that count. 28 U.S.C. § 2254(a) provides: "The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court *only on the ground that he is in custody* in violation of the Constitution or laws or treaties of the United

States." This "in custody" requirement has been interpreted to mean that federal courts lack jurisdiction unless the petitioner is "under the conviction or sentence under attack at the time his petition is filed." Maleng v. Cook, 490 U.S. 488, 490-491 (1989) (per curiam); Resendiz v. Kovensky, 416 F.3d 952, 955 (9th Cir. 2005). Although Petitioner is in custody to challenge the underlying convictions, he is not in custody to challenge charges that were dismissed or not found true. A successful challenge would not provide relief because Petitioner is not serving time for that count.

Petitioner's argument that he would not have been found guilty of false imprisonment if counsel had objected to the kidnaping count also lacks merit. Cal. Penal Code § 739 permits the prosecutor to charge the defendant with "either the offense or offenses named in the order of commitment or any offense or offenses shown by the evidence taken before the magistrate to have been committed." The prosecutor was free to charge Petitioner on the kidnaping count because there was in fact evidence at the preliminary hearing to support the charge. At the preliminary hearing, Detective Castaneda testified that the victim agreed to leave with Petitioner, who was holding a gun, to obtain drugs or money to repay Ms. Robinson's debt. (Doc. 61-1 at 58.) Castaneda stated that Petitioner told Ms. Robinson that he had kidnapped the victim and was going to kill him unless he got his money. (Det. 61-1 at 60-61.) During the time Petitioner drove the victim around, Petitioner had his firearm out and pointed at the victim. (Det. 61-1 at 61-62.) Thus, Petitioner fails to show that he suffered any prejudice since a motion to dismiss the charge would have been denied, and regardless, he was not found guilty of kidnaping by ransom.

Petitioner's contention that counsel failed to object to the instruction on felony false imprisonment was discussed in Ground One, *supra*. As the Court stated, Petitioner has not shown that counsel erred by failing to object since the state court determined that under California law, the jury was properly instructed on felony false imprisonment. He has also not shown any prejudice since an objection would have been futile. Substantial evidence existed to support the charge, and the trial judge had an obligation to instruct on the charge.

*h. Analysis – Failure to Meet with Client*

Petitioner next alleges counsel was ineffective because he failed to meet regularly with

him to establish a working attorney-client relationship thereby allowing Petitioner to participate in his defense. Petitioner claims he requested that counsel visit him more frequently to discuss his defense, but counsel refused to do so.

Petitioner's claim is conclusory in that he fails to state what counsel could have done had he made more visits to Petitioner. Moreover, as noted by Respondent, a review of the four Marsden hearing transcripts reveals that counsel was very familiar with Petitioner's case and had gone over the evidence and various defense strategies with Petitioner. (Doc. 60-1 at 9-14.) Petitioner fails to show counsel rendered ineffective assistance. He further fails to show prejudice since he does not establish the outcome would have been different had counsel made more frequent visits.

### i. Analysis – Failure to Keep Petitioner Updated

Petitioner contends that counsel failed to keep him updated on significant and relevant developments in the case. Instead of personally keeping Petitioner apprised, he passed messages to Petitioner using notes. Again, Petitioner's claim is conclusory. He fails to state what counsel could have done better had he personally discussed developments rather than passing him notes. He fails to show how the outcome would have been any different.

### j. Conclusion

In no instance does Petitioner establish that counsel's performance fell below an objective standard of reasonableness. Nor does he demonstrate that he suffered any prejudice such that the outcome would have been different but for counsel's alleged errors. Strickland, 466 U.S. at 694. A fairminded jurist could agree with the state court decision rejecting this claim, and thus it should be denied.

### 4. False Evidence

Petitioner next claims that the prosecutor knowingly used false testimony to obtain his conviction in violation of his constitutional rights. He notes that Ruvidia Robinson told Detective Castaneda that she had been with Petitioner during the two weeks prior to the shooting and that she had stolen Petitioner's drugs. Petitioner states he was in custody during that time so her testimony was clearly false. He claims Detective Castaneda was well aware that Petitioner was in

custody during that time and he still prepared his report knowing she was lying. Detective

Castaneda further testified to her false statements at the second preliminary hearing. Petitioner

claims the prosecutor knew Detective Castaneda testified falsely.

Petitioner raised this claim on state habeas review. In the last reasoned decision, the Kern

County Superior Court rejected the claim as follows:

> Petitioner contends his conviction is the product of false testimony.
>
> Under prior law, false testimony could not be remediable in habeas corpus unless the false testimony so fundamentally undermined the prosecution's case, not merely cast doubt upon it. In re Hall (1981) 30 Cal.3d 408, 410, 424.
>
> In later decisions, the court relaxed the standard where in the false testimony did not have to fundamentally undermine the conviction, but only create the probability that in its absence, there would be a probability of a change in the outcome of the case. In re Richards (2012) 55 Cal.4[th] 948; In re Richards (2015) 63 Cal.4[th] 291, 310.
>
> In this vein, there is no evidence of false testimony by any of the witnesses, even where Petitioner supplies the transcripts he asserts support his claim. He asserts that Officer Castaneda testified falsely, and the prosecution knows it. Petitioner nowhere elaborates why the testimony is false. Thus this claim is conclusory. People v. Duvall (1995) 9 Cal.4[th] 464, 474.
>
> Reviewing the criminal file, and the appellate opinion, there are no inconsistencies between the unfolding of events as outlined in the facts and the testimony by Officer Castaneda as reflected in the preliminary hearings and the appellate opinion. Petitioner points out testimony elicited on cross-examination that he was in custody from September 2012 through October 4, 2012. However, Petitioner committed the crime two days upon his release on parole[.] Not only was Petitioner arrested on or about October 14, 2012, but he was also cited for a parole violation. Officers spoke with his parole officer prior to the arrest. Additionally, upon reviewing the interview transcripts between Fern and Castaneda, there is no evidence of any "coaching" by the officer or overbearing techniques. Fern was not under arrest, and was free to go. Even though Fern's account is somewhat rambling, due to his admitted ingestion of methamphetamine and Southern Comfort, it is consistent with the facts of the instant case. Castaneda only asked clarifying questions, since Fern volunteered his version of events.
>
> Further, contrary to Petitioner's assertion, there is no newly discoverable evidence since the evidence used to secure a conviction existed at the time of the convictions. Thus the legislative amendment to P[enal] C[ode] Section 1473(b)3(A)(B) is inapplicable. In re Myles (2017) 7 Cal.App.5th 821.
>
> The court finds no false testimony proffered at the behest of the prosecution, or by any of the prosecution's witnesses.

(Doc. 60-1 at 22-23.)

*a. Legal Standard*

A petitioner is entitled to habeas corpus relief if the prosecutor's misconduct "so infected

the trial with unfairness as to make the resulting conviction a denial of due process." <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 643 (1974).  To constitute a due process violation, the prosecutorial misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." <u>Greer v. Miller</u>, 485 U.S. 756, 765 (1987) (quoting <u>United States v. Bagley</u>, 473 U.S. 667 (1985)).  Any claim of prosecutorial misconduct must be reviewed within the context of the entire trial. <u>Id</u>. at 765-66; <u>United States v. Weitzenhoff</u>, 35 F.3d 1275, 1291 (9th Cir. 1994).  The Court must keep in mind that "[t]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor" and "the aim of due process is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused." <u>Smith v. Phillips</u>, 455 U.S. 209, 219 (1982).  If prosecutorial misconduct is established, and it was constitutional error, the error must be evaluated pursuant to the harmless error test set forth in <u>Brecht v. Abrahamson</u>, 507 U.S. 619 (1993).  <u>See</u> <u>Thompson</u>, 74 F.3d at 1577 (Only if constitutional error is established "would we have to decide whether the constitutional error was harmless.").

"[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." <u>United States v. Agurs</u>, 427 U.S. 97, 103 (1976); <u>Napue v. Illinois</u>, 360 U.S. 264 (1959).  So must a conviction obtained by the presentation of false evidence. <u>See</u> <u>United States v. Bagley</u>, 473 U.S. 667, 678-80 nn.8-9 (1985).  In <u>Napue</u>, the Supreme Court held that the knowing use of false testimony to obtain a conviction violates due process regardless of whether the prosecutor solicited the false testimony or merely allowed it to go uncorrected when it appeared. <u>Id</u>. at 269.  The Court explained that the principle that a State may not knowingly use false testimony to obtain a conviction - even false testimony that goes only to the credibility of the witness - is "implicit in any concept of ordered liberty." <u>Id</u>.  To prevail on such a due process claim, "the petitioner must show that (1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) the false testimony was material." <u>United States v. Zuno–Arce</u>, 339 F.3d 886, 889 (9th Cir. 2003), <i>cert. denied</i>, 540 U.S. 1208 (2004).  Nevertheless, simple

inconsistencies in testimony are insufficient to establish that a prosecutor knowingly permitted the admission of false testimony. United States v. Zuno-Arce, 44 F.3d 1420, 1423 (9th Cir.1995). "Discrepancies in . . . testimony . . . could as easily flow from errors in recollection as from lies." Id.

### b. Analysis

The claim is meritless for numerous reasons. On its face, the claim fails because it was defense counsel, not the prosecutor, who elicited Detective Castaneda's testimony concerning Robinson's statements. At the second preliminary hearing, defense counsel asked Detective Castaneda when the last time she spoke to Petitioner was, and Castaneda stated she had told him she had been with Petitioner for the two weeks before the incident. (Doc. 61-1 at 92.) Defense counsel then asked Castaneda if he was aware that Petitioner had been in custody up until two days before the incident. (Doc. 61-1 at 93.) Likewise, at trial, defense counsel elicited the same testimony. He asked Castaneda if Robinson had told him she had been hanging out with Petitioner for two weeks before the incident and Castaneda responded that she had. (Doc. 61-11 at 64.) Defense counsel then asked Castaneda if he was aware at the time of those statements that Petitioner had actually been in custody up until two days prior to the incident, and Castaneda responded that he wasn't aware of that fact at the time. (Doc. 61-11 at 65.) Thus, the prosecutor did not knowingly solicit any false testimony. Moreover, it is clear defense counsel elicited the testimony to undermine Robinson's credibility and was not elicited by the prosecutor to obtain a conviction.

There is also no evidence that Detective Castaneda's testimony was false. Assuming Robinson's statements were false, Petitioner fails to show that Castaneda knew her statements at the time to be false. He stated he did not check Petitioner's custody records at the time and he was not aware when Petitioner had previously been in custody. Petitioner claims Castaneda had been in contact with Petitioner's parole agent prior to his interview of Robinson and therefore knew Petitioner was on parole; however, there is no evidence that Castaneda knew how long Petitioner had been out of custody. Thus, there is no evidence that Castaneda knew that Robinson lied to him.

There is also no question that Robinson's statements were immaterial to the prosecution in obtaining a conviction. In fact, Robinson's false statements to Castaneda were favorable to the defense, which is why defense counsel brought attention to them. There is no reasonable likelihood that the alleged false testimony could have affected the judgment of the jury for the benefit of the prosecution. <u>Agurs</u>, 427 U.S. at 103. For the foregoing reasons, Petitioner fails to show that the state court rejection of his claim was contrary to, or an unreasonable application of, controlling Supreme Court authority.

5. <u>Right to Confrontation</u>

Next, Petitioner claims his right to confrontation was violated when Robinson's statements were introduced at trial without allowing him the opportunity for cross-examination. The Kern County Superior Court rejected the claim in the last reasoned state court decision, as follows:

> Petitioner contends his confrontation rights were violated since the testimony used to obtain his conviction is inadmissible hearsay.
>
> The sixth amendment of the U.S. Constitution guarantees the right of the defendant to confront witnesses against them. <u>Crawford v. Washington</u> (2004) 541 U.S. 36. Where the evidence is testimonial (gathered in anticipation of litigation), the defendant has the right to cross examine the witness unless the witness is unavailable. <u>Giles v. California</u> (2008) 554 U.S. 353, 358 (citing) <u>Crawford v. Washington</u>[] (2004) 541 U.S. 36, 68.
>
> There is no question that Officer Castaneda's interviews with Fern, Robinson and Petitioner were testimonial. Petitioner had counsel during both the preliminary hearing and trial, and was able to cross-examine Officer Castaneda. Any interview with Robinson comes in under the hearsay exception of Proposition 115.
>
> At both preliminary hearings and trial, counsel cross-examined Officer Castaneda and other witnesses. According to the appellate opinion, Robinson admitted to stealing drugs from Petitioner. Kyle Cushman testified at the trial. Officer Castaneda, at the preliminary hearing stated that Officer Cushman showed up at the shooting and interviewed Fern's friends at the preliminary hearing[.] [T]estimony from unavailable witnesses is admissible without violating the confrontation clause under Cal. Ev. Code Section 1291(a)(2). <u>People v. Sapien</u> (1993) 4 Cal.4[th] 929.
>
> The prosecution did not need the testimony from Ruthinia Robinson to secure a conviction.
>
> The court finds no violation of the confrontation clause.

(Doc. 60-1 at 21-22.)

*a. Legal Standard*

38

The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const ., Amend. VI.  The Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant . . . had a prior opportunity for cross-examination." Crawford v. Washington, 541 U.S. 36, 53–54 (2004); Davis v. Washington, 547 U.S. 813, 821 (2006).  The Confrontation Clause applies only to "'witnesses' against the accused, i.e., those who 'bear testimony.'" Crawford, 541 U.S. at 51 (citation omitted); Davis, 547 U.S. at 823–24.  "'Testimony,' in turn, is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact." Crawford, 541 U.S. at 51 (citation and some internal punctuation omitted); Davis, 547 U.S. at 824.  Nevertheless, the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." Crawford, 541 U.S. at 59 n. 9. Additionally, a Confrontation Clause violation is subject to harmless error analysis. Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986).  A Confrontation Clause violation is harmless, and does not justify habeas relief, unless it had substantial and injurious effect or influence in determining the jury's verdict.  Brecht v. Abrahamson, 507 U.S. 619, 623 (1993).

*b. Analysis*

Here, the state court applied the correct legal standard under the Sixth Amendment by applying Crawford, 541 U.S. 36, and Giles v. California, 554 U.S. 353, 358 (2008).  Thus, the only question remaining is whether the state court's adjudication is objectively unreasonable. The Court concludes that it is not.

First, the Confrontation Clause is not implicated because the testimonial statements were introduced by Petitioner, not against him. Crawford, 541 U.S. at 51. Second, even if there was error, Petitioner is not entitled to relief because the statements did not have a "substantial and injurious effect or influence on the jury's verdict." Brecht, 507 U.S. at 637.  Defense counsel demonstrated that the statements could not be true because Petitioner was in custody when Robinson alleged she was with him.  In addition, as previously discussed, the evidence against Petitioner was strong.

Therefore, Petitioner is not entitled to habeas relief because the state court decision was not contrary to or an unreasonable application of clearly established Supreme Court precedent. Even if error occurred, it could have had no effect on the jury's verdict. The claim should be denied.

### 6. Cumulative Error

In his final claim, Petitioner alleges the combined effect of the individual errors violated his constitutional rights. Petitioner presented this claim in his state habeas proceedings, but the state courts did not provide a reasoned decision. Where a state court decides a claim on the merits but provides no reasoning for its decision, the federal habeas court conducts "an independent review of the record...to determine whether the state court [was objectively unreasonable] in its application of controlling federal law." Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2002). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

"Multiple errors, even if harmless individually, may entitle a petitioner to habeas relief if their cumulative effect prejudiced the defendant." Ceja v. Stewart, 97 F. 3d 1246, 1254 (9th Cir. 1996) (citing Mak v. Blodgett, 970 F.2d 614, 622 (9th Cir. 1992)); see also Karis v. Calderon, 283 F.3d 1117, 1132 (9th Cir. 2002). However, the Ninth Circuit has also recognized that where there is no single constitutional error, nothing can accumulate to the level of a constitutional violation. See Rup v. Wood, 93 F.3d 1434, 1445 (9th Cir. 1996). In this case, no errors occurred, and hence, there can be no cumulative error. Even if errors occurred, a reasonable factfinder could have found that the cumulative effect of the alleged errors did not prejudice Petitioner.

## IV. RECOMMENDATION

Based on the foregoing, the Court RECOMMENDS that the Petition for Writ of Habeas Corpus be DENIED with prejudice on the merits.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy of this Findings and Recommendation, any party

may file written objections with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the Objections shall be served and filed within ten court days (plus three days if served by mail) after service of the Objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:  **September 2, 2019**                          /s/ *Sheila K. Oberto*

UNITED STATES MAGISTRATE JUDGE